UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

PHILLIP DAUGHTRY,

               Plaintiff,

v.                              Case No. 3:11-cv-235-J-37TEM

SGT. HARRIS, et al.,

               Defendants.

---

## ORDER

### I. Status

Plaintiff, an inmate of the Florida penal system who is proceeding <u>pro</u> <u>se</u>, initiated this case by filing a Civil Rights Complaint (Complaint) (Doc. #1). Sgt. Harris and Correctional Officer Brad Macey are the named Defendants. Plaintiff contends that Defendants Harris and Macey subjected him to cruel and unusual punishment in violation of the Eighth Amendment when they used excessive force and physically assaulted him. He also claims Defendants Harris and Macey committed assault and battery, in violation of state law. Plaintiff asserts that they denied him equal protection of the law by their actions.

This cause is before the Court on Defendants' Motion for Summary Judgment (Doc. #60) (hereinafter Motion for Summary Judgment).[1] Plaintiff has responded (Response) (Doc. #64).

---

[1] The Court will refer to the exhibits appended to the Motion for Summary Judgment as "Ex."

## II.  Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Crawford v. Carroll, 529 F.3d 961, 964 (11th. Cir. 2008) (citing Fed. R. Civ. P. 56(c) and Wilson v. B/E/Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004)).

"The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Allen v. Bd. of Pub. Educ. for Bibb County, 495 F.3d 1306, 1313 (11th Cir. 2007) (citations omitted).

> "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324, 106 S.Ct. 2548).[2]

Id. at 1314.

---

[2] Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

## III. Plaintiff's Allegations and Exhibits

Plaintiff alleges the following facts in his sworn Complaint.  On November 1, 2010, at 2:30 p.m., Plaintiff was returned to Union Correctional Institution (UCI) from the Reception and Medical Center and placed in a holding cell in the Movement Center.  He was cuffed behind his back, with black box, waist chains and shackles.  He was waiting to be escorted to V dormitory, his assigned dormitory.  Other returning transport inmates were being escorted back to their cells.

Plaintiff followed all orders given to him by officers. Defendants Harris and Macey entered the holding cell and began punching Plaintiff in the head and face.  Defendant Macey repeatedly rammed Plaintiff's head and face into the concrete wall, causing blood to leak from Plaintiff's head and face. Afterwards, Defendant Macey said "f---boy this is for the law suits you filed against our co-workers.  And this is a warning to drop the law suits or die here at Union C.I."  Complaint at 9-C.

Plaintiff entered the outside exit door to the Movement Center, still restrained behind his back.  He informed the officers he was not going to drop his law suits.  Defendants Harris and Macey attacked Plaintiff, slamming him into the hard concrete floor.  They took turns punching, stomping, and kicking Plaintiff in the head, face, and his body.  Defendant Macey

3

rammed Plaintiff's head into the concrete floor, causing heavy blood to leak from Plaintiff's head and face.  Plaintiff cried and screamed for help and was rendered unconscious.

Defendants Harris and Macey did not call for a hand-held camera.  Instead, they dragged Plaintiff outside the Movement Center in full restraints.  They sprayed a whole can of pepper spray in Plaintiff's face.  Plaintiff cried and screamed for help.  The spray caused Plaintiff's eyes and seven cuts to burn. Defendant Macey said he was going to teach Plaintiff for filing lawsuits at UCI.  The Defendants dragged Plaintiff, while he was fully restrained behind his back, from the Movement Center to Urgent Care.  The Defendants threatened to kill Plaintiff if he reported the incident in a grievance.

An Urgent Care hand-held camera was used to monitor Plaintiff's movements in Urgent Care.  Plaintiff was examined by Dr. Aviles and Nurse Harris.  Nurse Harris washed the pepper spray off of Plaintiff's head and face and flushed the spray out of Plaintiff's wounds, eyes, and nose.  In addition, the blood was washed out of Plaintiff's wounds.  Plaintiff was taken upstairs to the showers, and he showered and removed the pepper spray from his body while the hand-held camera recorded the event.  Thereafter, he was escorted back to the emergency room.

Plaintiff told Dr. Aviles and Nurse Harris he was physically assaulted by Defendants Harris and Macey at the

4

Movement Center.  He also told them he was experiencing severe pain in his head, face, left shoulder, wrists, ankles, back, eyes, ears, neck and arms.  Plaintiff was provided with pain medication.  Due to the assault by the Defendants, Plaintiff received cuts to the face, head, wrists and ankles; he had swelling knots to the right and left sides of his forehead; he had swelling knots to his right eye and a black eye; and he had pain and swelling in his face, head, arms, wrists, ankles, eyes, left shoulder, neck, ears, and lower back.  He also suffered from physical and mental pain and anguish.

The Defendants wrote a false disciplinary report against Plaintiff to cover up their misconduct.  Plaintiff was charged with attempted battery of a correctional officer and was found guilty; however, on administrative appeal, the disciplinary conviction was overturned.

Plaintiff attached exhibits to the Complaint.  On November 1, 2010, Plaintiff received a disciplinary report for battery/attempted/correctional officer, written by Officer Harris.  Plaintiff's Exhibit D.[3]  On December 1, 2010, he was found guilty of this offense and received sixty days of disciplinary confinement.  Id.  Plaintiff, on December 7, 2010, submitted a Request for Administrative Remedy or Appeal to the

---

[3] The Court will hereinafter refer to the exhibits attached to the Complaint as "Plaintiff's Exhibit."

5

Warden of UCI.  Plaintiff's Exhibit C.  In this grievance appeal, Plaintiff complained that he was assaulted by Harris and Macey, and Harris falsified the disciplinary report.  Id. Plaintiff states that the disciplinary report statement of facts refers to Inmate Jones.  Id.  Plaintiff also complained that the disciplinary report does not include the amount and type of force used by the officers, including omitting the use of chemical agents.  Id.  On January 10, 2011, the Warden overturned the disciplinary report "based on technical errors made in the processing of same."  Id.

On November 22, 2010, Plaintiff submitted a grievance of a sensitive nature to the Secretary of the Florida Department of Corrections.  Plaintiff's Exhibit A.  The response dated December 9, 2010, informed Plaintiff that the matter had been referred to the Inspector General's Office.  Id.  On November 10, 2010, Plaintiff submitted a medical grievance to the Warden. Ex. B.  The response dated November 16, 2010, informed Plaintiff that the matter had previously been reported to the Inspector General.  Id.  Plaintiff appealed, but the appeal was considered to be a complaint against staff.  Id.  The response dated December 14, 2010, advised Plaintiff that the matter was before the Inspector General.  Id.

Plaintiff made sick call requests on November 1, 2010, November 3, 2010, November 8, 2010, and November 14, 2010.

6

Plaintiff's Exhibit E.  He complained about knots on his head, bruises, cuts and pain.  Id.  He also complained about his neck, left shoulder, wrist and ankles, lower back, ear, eyes, head and face.  Id.  He stated that it hurts when he moves his left shoulder and left wrist, and he requested x-rays.  Id. Additionally, he asked for pain medication and treatment.  Id. Finally, he states: "X-rays of left shoulder and left side wrist was [sic] taken on 11-8-10[.]  Need information results of x-rays[.]"  Id.

Inmate Michael A. Noel, in his Declaration, attests that on the evening of November 1, 2010, he observed the following injuries to Plaintiff: cuts to facial and head areas, big swelling knots to the right and left side of his forehead, big swelling knots to the right side of his eye, with a right black eye, and a busted lip and nose.  Plaintiff's Exhibit F.

Attached to Plaintiff's Response (Doc. #64) is the Chronological Record of Inpatient Mental Health Care for November 2, 2010.  It was noted that Plaintiff's pupils were red and watery and his vision in his right eye was blurred. Plaintiff's Exhibit A-2.  There were three small raised areas above both eyes.  Id.  There was another small raised area on the left side of his forehead.  Id.  He complained of knots on his head, bruises, pain, and blurred vision.  Id.  In response,

Plaintiff was advised to use hot and cold compresses, to rinse his eyes, and to return to sick call if needed.  Id.

## IV. Defendants' Motion for Summary Judgement

The Defendants specifically deny beating Plaintiff or abusing him in any way.  Specifically, in his Declaration, Defendant Macey states:

> On November 1, 2010, I was assigned as a Transport Officer.  This means I was working internal security in the Movement Center and was responsible for escorts on the compound and transport.
>
> Before 3:25 p.m., a group of inmates had returned to Union CI from the Reception and Medical Center.  There were some open population inmates on the transport and upon arrival those inmates were given a pass and were allowed to walk back to their assigned dormitories.  There were also four inmates on the transport who were either in confinement or mental health dorms, including inmate Phillip Daughtry, DC# K53079, who was assigned to V-dorm.  There were two other V-dorm inmates and one O-dorm inmate.
>
> Department rules require inmates in confinement or certain mental health statuses to be escorted on a on-to-one basis, meaning there must be at least one officer present with each inmate during the escort.  Because these inmates are not allowed to freely roam the compound, they are taken to the Movement Center upon arrival at Union CI and are placed in holding cells until officers from their assigned dorms can come and escort them back to the dorm.
>
> Within the Movement Center, there is a separate room that has five holding cells in it.  I cannot recall which holding cell

8

Daughtry was placed in, but I know it was not the first or the last cell.

Inmates are transported to and from RMC cuffed in front, due to riding in the transport vehicle. Once they return to the institution, confinement or mental health status inmates must be cuffed behind the back. . . .

. . . .

Because Daughtry was still waiting to be escorted out of the Movement Center, his restraints were left on and were not yet moved from the front to the back.

After the V-dorm officers came and left with the two other V-dorm inmates, an officer from O-dorm arrived and took the one O-dorm inmate back to the O-dorm. At this point, I could have waited on one of the V-dorm officers to return, but if internal security is available to do an escort, we usually just do it. I was available and decided to do the escort myself, rather than wait on the V-dorm officers to come back. Also, because I was working in the Movement Center that day, it would be easy for me to escort Daughtry to his dorm and then return the Movement Center restraints back to the Movement Center.

At approximately 3:25 p.m., I went into Daughtry's holding cell, removed Daughtry's waist chain, black box and handcuffs and then replaced them behind his back, as required by Department rules. Daughtry was also wearing a spit shield, which consists of a piece of blue cloth that is elasticized on the top and bottom that covers the area below the nose down to below the chin, which is connected to a piece of black netting that goes over the inmate's face. The spit shield is authorized when an inmate has a history of spitting on people and is designed to

9

reduce the risk of transmitting saliva, mucus or other fluids. The spit shield does not completely prevent an inmate from spitting or biting. The blue cloth is extremely thin and an inmate can easily bite through it. Inmates also frequently pull the elasticized blue cloth down under their chin, and can then spit or bite through the black netting.

While we were inside the holding cell, Daughtry started getting verbal and mouthy with me. I cannot recall exactly what he was saying, but I do remember there was a verbal altercation.

Once Daughtry's restraints were moved to behind his back, I escorted Daughtry out of the holding cell. When we were just outside of the holding cell area, I saw Sergeant Michael Harris and asked him to assist me with the escort due to Daughtry becoming agitated in the holding cell. Sergeant Harris agreed to assist me, and we began escorting Daughtry together through the Movement Center.

Once we were near the door to the Movement Center, with the Sergeant's Office to the left of us, Daughtry stopped walking. I ordered Daughtry to continue walking and ordered him to return to the holding cell, and each time he would start moving and appear to be complying with our orders, he would stop walking again. Daughtry began trying to break our hold on him by twisting and thrashing his body. At this time, Sergeant Harris and I forced Daughtry to the Movement Center floor facedown. Once Daughtry stopped resisting, we quickly brought him back up to his feet. Sergeant Harris and I had Daughtry on the floor an estimated 15-30 seconds. Because force was used, Daughtry was required to have a post use of force physical. Rather than return to the holding cell as originally planned, we continued to escort

10

Daughtry to Urgent Care where he would be examined by medical.

After we got outside the Movement Center door, we took a left turn and just prior to reaching the exit gate, Daughtry began resisting again. This time, Daughtry was more violent. He was thrashing his body around and tried to kick and head butt both me and Sergeant Harris. Daughtry also tried to bite our hands as we held on to his arms. Sergeant Harris pulled out his chemical agent canister from the holder at his waist and ordered Daughtry to stop resisting. Daughtry refused and continued his disorderly behavior. In order to prevent further assault by inmate Daughtry, Sergeant Harris applied chemical agents which quickly brought Daughtry under control. Sergeant Harris and I continued to escort Daughtry to Urgent Care for his post use of force physical, without further incident. Sergeant Combs and Officer Slocum were not present during any part of this incident.

. . . .

I had no knowledge of any lawsuits Daughtry may have filed against other officers or staff at Union CI. I did not call Daughtry a "f---boy" or use any derogatory language toward him. Sergeant Harris and I never threatened to kill Daughtry if he wrote a grievance concerning this incident. Sergeant Harris and I did not ever punch, stomp on, or kick Daughtry during this incident, nor did I ram Daughtry's head into the Movement Center floor. I also did not drag Daughtry anywhere. At no time during this incident did I or Sergeant Harris assault Daughtry as alleged. If I had observed such actions I would have reported them to the appropriate authorities.

My actions in forcing Daughtry to the ground were necessary in order to end

Daughtry's disruptive behavior during the escort back to V-dorm. . . .

Ex. A at 1-3 (enumeration omitted).

Defendant Harris states, in his Declaration,

On November 1, 2010, I was assigned as Internal Security Sergeant. At approximately 3:25 p.m., I was either coming from or heading to my office, which is near the area in the Movement Center where this incident occurred. I was stopped by Officer Brad Macey, who was in [the] middle of escorting inmate Phillip Daughtry, DC# K53079, back to V-dorm. Officer Macey asked me to accompany him on the escort, and I agreed. We began escorting Daughtry together and headed toward the Movement Center door.

When we reached the area just before the door, Daughtry stopped walking and refused to return to his dorm. I ordered Daughtry to walk several times, and each time he refused. Because I was concerned that Daughtry's behavior might escalate and lead to a more dangerous situation, I ordered Daughtry to go back to the holding cell within the Movement Center. Daughtry started to comply, but then stopped and refused to walk again.

I held on to Daughtry's right side, and with the assistance of Officer Macey, tried a final time to escort Daughtry back to the holding cell. Daughtry continued his refusal to comply and began trying to pull away from us by thrashing his body. Officer Macey and I forced Daughtry to the ground, facedown, in order to stop Daughtry's disorderly behavior.

Daughtry continued to struggle on the ground, but after I gave several orders for him to cease his actions, he finally complied. Officer Macey and I quickly

12

brought Daughtry to his feet and continued
the escort.

At this point, because we had just
used force on Daughtry by taking him down
to the ground, I ordered him to walk toward
Urgent Care, where he could be seen by
medical for his required post use of force
physical.

We exited the Movement Center and just
before we made it to the gate, I called for
the hand-held camera to meet us on the
roadway.  Right after I called for the
camera, Daughtry suddenly stopped walking
again.  Daughtry was nearly uncontrollable
- he was trying to head butt, kick and spit
on both myself and Officer Macey.  Daughtry
also tried to bite both of us, twisting his
body from side to side where he could reach
our hands holding on to Daughtry's biceps.
Although Daughtry was wearing a spit shield
during this incident, the spit shield does
not completely prevent an inmate from
spitting or biting.  The netting keeps
fluids from projecting very far, but you
can still get a spray through it, similar
to a screen door.  The cloth part of the
spit shield is thin and an inmate can
easily bite through it, just like you could
bite through a t-shirt.

In addition, Daughtry tried to snatch
away from our grasp by violently twisting
his body and doing whatever he could to try
to get away.  I gave him several orders to
stop his assaultive behavior, but Daughtry
refused.  I then broke the seal on my gas
canister # 0000942 and gave Daughtry a
final order to stop resisting or else
chemical agents would be used.  I made the
decision to use chemical agents in order to
protect Officer Macey and myself from
further assault and in order to prevent
further injury to Daughtry.  We had already
taken Daughtry to the ground facedown on a
concrete floor.  Rather than do another
takedown on a concrete surface, and risk

potential injury to Daughtry, I chose to use chemical agents.

After I gave the final order, Daughtry still did not comply. He continued to twist his body and tried to assault me and Officer Macey. In order to stop his assaultive behavior and gain control over the situation, I administered two one-second bursts of Oleo Resin Capsicum Pepper Spray to Daughtry's facial area. Daughtry immediately became 100 percent compliant with my orders and we completed the escort to Urgent Care without incident. Once we arrived at Urgent Care, other officers assumed the responsibility for the post use of force proceedings and decontamination shower, relieving Officer Macey and me. Sergeant Combs and Officer Slocum were not present during any part of this incident.

. . . .

I was not present in the holding cell area during any part of this incident. . . . At no time did I or Officer Macey ever punch, stomp on, or kick Daughtry during this incident, nor did Officer Macey ram Daughtry's head into the Movement Center floor. I had no knowledge of any lawsuits Daughtry may have filed against other officers or staff at Union CI. Officer Macey and I never threatened to kill Daughtry if he wrote a grievance concerning this incident, nor did we drag him anywhere. At no time during this incident did I or Officer Macey assault Daughtry as alleged. If I had observed such actions I would have reported them to the appropriate authorities.

My use of chemical agents in this case was done in order to prevent further assault on myself and Officer Macey and in order to prevent further injury to Daughtry. The use of chemical agents does not pose the same risk of injury as taking an inmate, cuffed behind the back, face

14

> down on concrete.  As we had already used physical, hands-on force on Daughtry, I elected to use chemical agents for the protection of everyone involved, including Daughtry.  The allegation that I sprayed an entire can of chemical agents is simply not credible.  I administered 2 one-second bursts of chemical agents, not an entire can.  The Chemical Agent Accountability Log, attached to this declaration,[4] shows that the canister weighed 125 grams prior to this use of force, and weighed 120 grams after.

Ex. B at 1-3 (enumeration omitted).

Affiant Janet Clark attests that on November 1, 2010, she was assigned as the Sergeant in the Visiting Park/Movement Center, and she was seated in the Sergeant's Office.  Ex. G. She states that she is just over five feet tall and could not see everything that happened during the escort.  Id.  She could see Officer Macey escorting Plaintiff when Plaintiff was taken down to the ground.  Id.  She states that Officer Macey quickly brought Daughtry back to his feet and then escorted him through the door outside the Movement Center.  Id.

Affiant Ashley Davis attests that on November 1, 2010, while assigned as a Classification Officer at UCI, she was located in the Sergeant's Office and saw Sergeant Harris and Officer Macey escorting Plaintiff out of the building.  Ex. H. Plaintiff was belligerent and pulled away and struggled with

---

[4] The Court notes that the Chemical Agent Accountability Log is not attached to the Declaration of Michael Harris.

Sergeant Harris and Officer Macey.  Id.  Daughtry was taken to the ground.  Id.  Ms. Davis could see Officer Macey's back.  Id. "I did not see any movements by Sergeant Harris or Officer Macey that suggested they were hitting, punching, kicking or otherwise assaulting inmate Daughtry.  Sergeant Harris and Officer Macey then assisted Daughtry to his feet and escorted him out of the building."  Id.

In the Declaration of Emile Sistrunk, she states that as a former Inspector for the Use of Force Unit, based on her experience investigating uses of force, five grams of a chemical agent is considered a minimal or nominal amount of chemical agent in the context of a use of force.  Ex. I.

With regard to Plaintiff's claimed injuries, Sandra Crews, the camera operator for the post use of force medical examination of Plaintiff, attests that she "did not see any significant injuries to [Plaintiff's] face or head, nor did [she] see any copious amounts of blood."  Ex. L.  The Emergency Room Record shows that Plaintiff's vitals were taken and he was seen by Dr. Aviles and Nurse Harris.  Ex. J.  A Diagram of Injury is provided with a description of injury.  Id.  In his Declaration, Dr. Ogunsanwo, the Assistant Secretary of the Office of Health Services, explains:

> The medical records reflect that on November 1, 2010, at 3:30 p.m., inmate Daughtry, DC# K5309, was examined by Nurse Harris and Dr. Aviles at Union Correctional

Institution.  Daughtry complained of his eyes and nose burning, and his respiration was even and unlabored.  No distress was noted.  Examination revealed a laceration measuring 1 cm long, 1/4 cm wide and 1/4 cm deep to the top lip, two superficial scratches above the left eye, minimal swelling to the right eyebrow, and an abrasion to the tip of the nose.  Daughtry had a normal range of motion in his neck and in his extremities.  No other injuries were noted by Nurse Harris or Dr. Aviles.

Daughtry's eyes were flushed with purified water and he was provided Tylenol. Daughtry was advised to keep the area clean and dry and to report any signs of infection, sudden nausea or vomiting, visual changes, or severe headache.  It was noted that following treatment, Daughtry was relaxed.

Ex. K at 1-2.

Plaintiff admits in his deposition that the lacerations he received on his wrists and ankles did not bleed profusely, and the blood did not drip on his clothes.  Ex. C at 72-73.  He states that when he was taken to the ground, he was down for three or four minutes.  Id. at 73.  He also states that he was sprayed with a whole can of mace.  Id.  As far as his injuries, he attests that Nurse Harris and Dr. Aviles did not document the cuts on his wrists and ankles and the knots and swelling of his face.  Id. at 89.

## V.   Law and Conclusions

The Eleventh Circuit has set forth the standard for an excessive use of force claim for an inmate:

17

The use of force constitutes cruel and unusual punishment where it is applied "maliciously and sadistically to cause harm." Skrtich, 280 F.3d at 1300.[5]  Thus, in order to prevail on an excessive-force claim, a plaintiff must demonstrate that those who used force against him acted with a malicious purpose. See Johnson v. Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002). In addition, a plaintiff must prove that a requisite amount of force was used against him. Hudson v. McMillian, 503 U.S. 1, 9-10, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. (quotation omitted). In determining whether the amount of force used against an inmate was de minimis, a court may consider the extent of the injuries suffered by the inmate. Skrtich, 280 F.3d at 1302. Nevertheless, a court ultimately should decide an excessive force claim "based on the nature of the force rather than the extent of the injury." Wilkins v. Gaddy, 559 U.S. --, --, 130 S.Ct. 1175, 1177, -- L.Ed.2d -- (2010).

Vicks v. Knight, 380 F. App'x 847, 851 (11th Cir. 2010) (per curiam) (not selected for publication in the Federal Reporter).

See Wilkins v. Gaddy, 130 S.Ct. 1175, 1178-79 (2010) (per curiam) (finding "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury"); Logan v. Smith, No. 11-10695, 2011 WL 3821222,

---

[5] Skrtich v. Thornton, 280 F.3d 1295 (11th Cir. 2002).

at *4 (11th Cir. 2011) (per curiam) (not selected for publication in the Federal Reporter) (deciding the video and medical evidence did not flatly contradict the inmate's allegations; disallowing plenary summary judgment on the excessive force claim, finding it inappropriate; and determining the evaluation of the evidence is a matter for a jury).

The Eleventh Circuit, in <u>Hall v. Bennett</u>, No. 10-12869, 2011 WL 5903541, at *2 (11th Cir. 2011) (per curiam) (not selected for publication in the Federal Reporter) (citation omitted), being "mindful of the fact that the focus of the inquiry is on the nature of the force applied, not the extent of injury[,]" recognized that it was left with reviewing two competing, contradictory stories of what happened during an alleged assault by an officer on an inmate, and found the record presented a material issue of fact, precluding summary judgment.

In Plaintiff Daughtry's case, the Court recognizes that apparently there were no witnesses to the alleged use of force in the holding cell or to the use of chemical spray. There were witnesses to the take down of Plaintiff to the ground, but apparently these witnesses' views were somewhat limited due to the individual's height and/or location. Immediately after these incidents, Plaintiff was examined by a nurse and a doctor. Evidence of trauma was noted by medical staff. Plaintiff presented medical complaints and he had visible physical

19

injuries.[6]  Apparently, x-rays were ordered, and pain relief
medication  was  provided.   Thus,  the  medical  assessments
undertaken  shortly  after  the  alleged  incident  support
Plaintiff's  allegations  that  he  suffered  some  injuries.
Additionally,  Plaintiff  has  provided  the  declaration  of  an
inmate witness that observed Plaintiff's injuries that evening.
Although the Defendants' Motion for Summary Judgment presents
a  close  call  situation,  "the  record  evidence  does  not  flatly
contradict [Plaintiff's] allegations and, therefore, his version
of the events cannot be discounted-nor the defendants' version
credited-at  this  point  in  the  litigation."[7]   _Logan_, 2011 WL

---

[6] The Court was not provided with a DVD of the follow-up
medical care recorded by the handheld camera or with any DVD's
from fixed wing cameras of these incidents.

[7] Defendants, in their Notice of Supplemental Authority
(Doc. #112), cite _Ledlow v. Givens_, No. 12-12296, 2012 WL
6176471, at *2 (11th Cir. Dec. 12, 2012) (per curiam) (not
selected for publication in the Federal Reporter), as authority
for their position; however, inmate Ledlow removed his handcuffs
and was chasing after another inmate, and the officer applied
force to resolve the volatile situation.  In addition, a fellow
inmate's affidavit stating that the officer punched, slapped and
kicked inmate Ledlow was disregarded because its allegations
were incompatible with Ledlow's allegations that he was merely
slapped with an open hand.  _Id._ at *3.  Defendants also rely on
_Tate v. Rockford_, No. 11-11708, 2012 WL 5846290, at *2 (11th
Cir. Nov. 19, 2012) (not selected for publication in the Federal
Reporter), but in that case it was undisputed that there was a
physical altercation in the prison dormitory in an area filled
with other inmates.  Additionally, inmate Tate did not dispute
that fact that the officer ordered him to step away from the
gate several times.  _Id._  Inmate Tate further admitted that he
pushed the officer's hand away.  _Id._  In the instant case,
according to Plaintiff Daughtry, he never failed to comply with
the orders of the officers.  Daughtry claims that the officers

3821222, at *2.  Defendants claim they are entitled to qualified immunity; however, "[i]n this Circuit, a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment . . . ."  Skrtich, 280 F.3d at 1301.

Plaintiff also raises the following state law claims: assault and battery.  Since the Eighth Amendment claim (excessive use of force) survives the summary judgment stage and since the state law claims arise from the same nucleus of operative facts as the Eighth Amendment claim, this Court will exercise supplemental jurisdiction over the state law claims.

Finally, Plaintiff raises an unsupported and conclusory equal protection claim.  See Motion for Summary Judgment at 22-23.  Defendants' Motion for Summary Judgment is due to be granted with respect to the equal protection claim.

─────────────────────

entered the holding cell and attacked him.  Additionally, Daughtry claims he was not disruptive on the walk to his dormitory, and that the uses of force were unnecessary and excessive.  Finally, Defendants rely on Muhammad v. Sapp, No. 10-15381, 2012 WL 5359235, at *3 (11th Cir. Nov. 1, 2012) (per curiam) (not selected for publication in the Federal Reporter), a case in which the officers used force to require inmate Muhammad to shave after he declined to shave.  Again, Plaintiff Daughtry states that he never refused to comply with the directives of the officers and they assaulted him without provocation.  Therefore, these cases are distinguishable from Plaintiff's case, not only with respect to the extent of the injuries, as Plaintiff had more that a simple cut or bloody nose, but also with respect to Plaintiff's contention that he never refused to comply with the orders of the officers and the officers attacked him without provocation or in retaliation for his lawsuits.

Therefore, it is now

**ORDERED:**

Defendants' Motion for Summary Judgment (Doc. #60) is **GRANTED** with respect to the equal protection claim.  In all other respects, the Motion for Summary Judgment (Doc. #60) is **DENIED.**

**DONE AND ORDERED** at Jacksonville, Florida this 15th day of February, 2013.


ROY B. DALTON, JR.
United States District Judge


sa 2/13
c:
Phillip Daughtry
Ass't A.G. (Braun)

Ass't A.G. (Maher)